# United States Court of Appeals

## For the First Circuit

---

Nos. 00-1610, 02-2047

SENAIT FESSEHA,

Petitioner,

v.

JOHN ASHCROFT, Attorney General,

Respondent.

---

ON PETITIONS FOR REVIEW OF ORDERS OF THE
BOARD OF IMMIGRATION APPEALS

---

Before

Selya, Circuit Judge,
Cyr, Senior Circuit Judge,
and Lynch, Circuit Judge.

---

Ilana Greenstein with whom Harvey Kaplan, Maureen O'Sullivan, Jeremiah Friedman, and Kaplan, O'Sullivan & Friedman, LLP were on brief for petitioner.

Joan E. Smiley, Trial Attorney, Office of Immigration Litigation, with whom Robert D. McCallum, Jr., Assistant Attorney General, Civil Division, and Richard M. Evans, Assistant Director, Office of Immigration Litigation, were on brief for respondent.

---

June 16, 2003

---

**LYNCH**, **Circuit Judge**. Petitioner Senait Fesseha is an Ethiopian citizen who applied for asylum due to past political persecution, as well as a fear of future persecution based on her ethnicity as an Amhara. An Immigration Judge (IJ) denied her asylum application and the Board of Immigration Appeals (BIA) affirmed. Fesseha then moved to reopen, based on changed country conditions. The BIA denied the motion. She petitions for review of both the denial of asylum and the denial of her motion to reopen. We affirm both denials.

I.

A. Factual Background

The evidence submitted to the IJ is fairly summarized as follows. Fesseha was born in Addis Ababa, Ethiopia in 1965. She is an ethnic Amhara. Her family supported the government of Emperor Haile Selassie, who ruled Ethiopia from 1916 to 1974, excepting only a period of time during World War II, when Ethiopia was occupied by Italy. Fesseha's father was a colonel in the army under Selassie. In 1974, Selassie was overthrown in a coup d'etat by the Provincial Military Administrative Council, known as the "Dergue." In 1977, Dergue leader Colonel Mengistu assumed power, which he retained until 1991. At least two of Fesseha's cousins were members of the Ethiopian People's Revolutionary Party (EPRP), a group opposed to the Dergue regime. While Fesseha herself was not a member, she was also opposed to the Mengistu regime.

Fesseha's family suffered under Dergue rule. Her father was fired from his job when his company was nationalized, and in 1984 he was detained outside of his house. The government also took away land owned by Fesseha's mother in Addis Ababa. One of her cousins, a member of EPRP, was imprisoned in the late 1970s and is presumed dead. Another cousin, also an EPRP member, was arrested in the early 1980s and conscripted into the army, where he died. Fesseha also believes that a third cousin was killed by the government.

Fesseha herself has been detained and arrested several times by members of kebelles, which were local committees organized to police neighborhoods. In 1982 she was arrested and detained overnight.[1] In 1983 she was again arrested after she missed a kebelle meeting.[2] In 1985 she was arrested, detained overnight, and was forced to perform free labor at the kebelle office.[3] After the third arrest, Fesseha fled the country.

---

[1] Fesseha originally claimed that she was accused of being a member of the EPRP. She later specified that she was accused of being "anti-government," but that the accusation did not refer to the EPRP explicitly.

[2] In her asylum application she claimed that she was detained for 48 hours, but she later testified that she was only held overnight.

[3] Fesseha wrote in her asylum application that she was forced to perform labor for three weeks, but later testified that the period was only a week.

Fesseha obtained a student visa to the United States and arrived in Boston on April 29, 1985 to attend Newbury Junior College, although she attended Massasoit Community College instead, only receiving the required authorization for the transfer after the fact. Contrary to the visa, she obtained a job in June 1985 as a housekeeper and later worked as a cashier in a market without proper authorization.

B. Asylum Claim

Fesseha applied for political asylum on August 8, 1988. Because Fesseha had a nonimmigrant student visa, she was authorized to remain in the United States only so long as she maintained her status as a student. On June 1, 1989, the Immigration and Naturalization Service (INS) charged her with deportability because she was employed without INS authorization, in violation of her visa. On August 14, 1989, during the first deportation hearing, Fesseha admitted the allegations against her and conceded deportability but requested withholding of deportation. Deportation hearings were held in Fesseha's case on August 14 and December 8, 1989, July 19, 1991, November 10, 1992, and August 12 and September 17, 1993.

On October 10, 1992, Fesseha submitted a motion requesting that the IJ amend her application for asylum to include "nationality" as an additional ground. While the IJ never explicitly ruled on this motion, on November 10, 1992, he added the

-4-

motion to the record and admitted into evidence her submission of more recent articles and documents regarding the current state of affairs in Ethiopia.

The IJ denied Fesseha's application for asylum and withholding of deportation on September 17, 1993. The IJ based his decision on both a negative credibility finding and a determination that Fesseha had not established a well-founded fear of future persecution. He relied in part on his finding that "conditions in Ethiopia have changed with the new government."

Fesseha timely appealed to the BIA. Seven years later, on April 13, 2000, the BIA upheld the decision of the IJ. The BIA noted that Fesseha had lied about her claim that she was accused of being a member of the EPRP. But even accepting the rest of her testimony as true, it found she had not "demonstrated past persecution or satisfied the well-founded fear standard of eligibility required for asylum." Fesseha filed a petition for review of the BIA's decision with this court on May 12, 2000.

C. <u>Motion to Reopen</u>

On July 10, 2000, Fesseha also filed a motion to reopen with the BIA.[4] That motion was based on a change of country conditions rooted in the 1991 overthrow of Mengistu's government.

---

[4] Fesseha's appeal of the April 13, 2000 BIA decision, case no. 00-1610, was held in abeyance until the BIA acted upon the motion to reopen. That appeal was then consolidated with her appeal of the BIA's denial of her motion to reopen, case no. 02-2047.

With her motion Fesseha presented evidence tending to show the following. In May 1991, the Ethiopian People's Revolutionary Democratic Front (EPRDF), a coalition of ethnic-based insurgent groups dominated by the Tigray People's Liberation Front, defeated Mengistu's Dergue regime and seized power. Initially, the new government promised to be a more humane one. It disbanded the kebelles, though it created a similar system of "Peace and Stability Committees." The EPRDF government also ratified many international human rights conventions, incorporated human rights treaties into domestic law, and adopted a constitution which included human rights provisions.

Unfortunately, the EPRDF proved no more friendly to political opposition than the previous regime. As early as 1991 the EPRDF detained several EPRP activists and took other action to discourage opposition groups. When the government presided over elections in 1995, opposition groups claimed that the government took steps to prevent their participation. The State Department, in its 1999 country report for Ethiopia, concluded that "[p]olitical participation remains closed to a number of organizations," including the EPRP.

The EPRDF also has been accused of imprisoning more than ten thousand people for political reasons and of using heavy-handed tactics to disband opposition parties and human rights groups.

Some regional political parties have even complained that the government has executed their members and supporters.

Fesseha's motion to reopen cited various accusations against the EPRDF regime by sources such as the State Department, the International Committee of the Red Cross, Amnesty International, and Human Rights Watch. Fesseha argued that due to the recent shift in power, and the resulting acceleration of oppression of opposition groups such as the EPRP, her asylum claim based on fear of political persecution had been strengthened.

On July 29, 2002, the BIA denied the motion to reopen. Fesseha timely petitioned this court for review of both the BIA's initial rejection of her asylum claim and its denial of her motion to reopen.[5]

II.

A. <u>Denial of Asylum</u>

1. <u>Legal Standard</u>

Determinations of eligibility for asylum or withholding of deportation are reviewed under the substantial evidence standard: the agency's decision must be upheld if "supported by reasonable, substantial, and probative evidence on the record considered as a whole." <u>INS</u> v. <u>Elias-Zacarias</u>, 502 U.S. 478, 481

---

[5] The Attorney General has been substituted for the INS as respondent with the implementation of the Homeland Security Act of 2002, Pub. L. No. 107-296, §§ 441, 471, 116 Stat. 2135, 2192, 2205 (Nov. 25, 2002). <u>See</u> 8 U.S.C. § 1252(b)(3)(A) (2000).

(1992) (internal quotation omitted); see Albathani v. INS, 318 F.3d 365, 372 (1st Cir. 2003).  This standard is a deferential one: the petitioner must demonstrate "that the evidence he presented was so compelling that no reasonable factfinder could fail to find the requisite fear of persecution."  Elias-Zacarias, 502 U.S. at 483-84; see 8 U.S.C. § 1252(b)(4)(B) (2000) ("[T]he administrative findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary."); Oliva-Muralles v. Ashcroft, 328 F.3d 25, 27 (1st Cir. 2003).  Our review is of the entire record before the BIA, not merely of the evidence supporting the agency position, Albathani, 318 F.3d at 372, but we examine only the administrative record, 8 U.S.C. § 1252(b)(4)(A).  See Gailius v. INS, 147 F.3d 34, 44 (1st Cir. 1998).

The Attorney General may grant asylum to an alien who is otherwise inadmissible or deportable, but only if that alien is a "refugee."  8 U.S.C. § 1158(b)(1) (2000).  A refugee is an alien "who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, [her home] country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion."  Id. § 1101(a)(42)(A) (2000).  The burden is on the alien to prove refugee status.  Civil v. INS, 140 F.3d 52, 55 (1st Cir. 1998); 8 C.F.R. § 208.13(a) (2003).

Applicants must show either past persecution or a well-founded fear of future persecution.  Id. § 208.13(b). "[P]ersecution encompasses more than threats to life or freedom, but less than mere harassment or annoyance." Aguilar-Solis v. INS, 168 F.3d 565, 570 (1st Cir. 1998).  Applicants must also provide "conclusive evidence" that they were targeted based on one of the five asylum grounds.  Albathani, 318 F.3d at 373; Velasquez v. Ashcroft, 316 F.3d 31, 35 (1st Cir. 2002).  Once applicants have proven past persecution, they are presumed to have a well-founded fear of future persecution unless the agency can prove otherwise. In re H., 21 I & N Dec. 337, 346 (BIA 1996); 8 C.F.R. § 208.13(b)(1)(ii).

To show a well-founded fear of future persecution, applicants must meet both subjective and objective prongs. Alvarez-Flores v. INS, 909 F.2d 1, 5 (1st Cir. 1990).  "[T]he asylum applicant's fear must be both genuine and objectively reasonable." Aguilar-Solis, 168 F.3d at 572.  For proving either past or a fear of future persecution, an applicant's testimony, if credible, may be sufficient.  8 C.F.R. § 208.13(a).[6]

_____

[6] Fesseha has also appealed the BIA's denial of withholding of deportation.  Withholding is only mandatory when an alien presents "evidence establishing that it is more likely than not that the alien would be subject to persecution on one of the specified grounds." INS v. Stevic, 467 U.S. 407, 429-30 (1984).  Because the withholding of deportation standard is more difficult to meet than the asylum standard, "a petitioner unable to satisfy the asylum standard fails, a fortiori, to satisfy the former." Albathani, 318 F.3d at 372 (citation omitted).  Because we affirm the BIA's

The BIA decision did not rest on the IJ's finding that Fesseha's testimony was not credible. However, the BIA did note that she "fabricated her claim that government officials accused her of membership in the [EPRP]." The BIA found that "even accepting that [Fesseha]'s testimony was truthful and accurate," Fesseha had not demonstrated either past persecution or a well-founded fear of future persecution. There was substantial evidence supporting this conclusion.

As to the evidence of past persecution, the BIA found that "the instances of detention do not rise to the level of persecution as [Fesseha] was released unharmed." The decision noted that "[Fesseha] herself stated that she was detained, not imprisoned." Fesseha had testified that she was held only twenty-four hours each time, and she was not harmed. Moreover, while Fesseha testified that she "was accused of being anti-government," and that she assumed the accusation related to the EPRP membership because of her cousins' affiliations, there was no evidence or testimony indicating that her captors actually believed she was a member of EPRP. In short, there was substantial evidence to support the BIA's determination that Fesseha's detainments were too short and too tangentially related to political affiliation to constitute persecution under 8 U.S.C. § 1101(a)(42)(A) and 8 C.F.R.

decision that Fesseha does not meet the standard for asylum, we need not consider her withholding of deportation claim.

-10-

§ 208.13(b).  See Nelson v. INS, 232 F.3d 258, 265 (1st Cir. 2000) ("[P]ersecution requires more than occasional detention, and, indeed, more than occasional instances of physical abuse.").

As to her claim of a well-founded fear of future persecution, the BIA found that Fesseha had not shown that "a reasonable person in her circumstances would fear persecution on account of race, religion, nationality, membership in a particular social group, or political opinion."  This finding was based in part on the IJ's finding that "Ethiopia is undergoing a transition to a federal system of government with an elected government," which the BIA found "fatally undermined [Fesseha]'s claim that she possessed a well-founded fear of persecution."  Fesseha has not presented evidence that would compel a reasonable adjudicator to conclude to the contrary.

As to her amended claim based on ethnic persecution against Amharas under the post-1991 regime, neither the IJ nor the BIA separately analyzed the evidence, possibly because Fesseha did not clearly distinguish this as a separate claim.  (Nor did Fesseha attempt to buttress such a claim when she moved to reopen.)  Nevertheless, both the IJ and the BIA found Fesseha had failed to meet her burden on grounds of race, nationality and membership in a  particular social group, thus rejecting her claim based on Amhara status.  Nothing in the record compels a different conclusion.

-11-

B.  Motion to Reopen

"[M]otions to reopen are disfavored in deportation proceedings" because of the "strong public interest in bringing litigation to a close . . . promptly." INS v. Abudu, 485 U.S. 94, 107 (1988).  There are two threshold requirements for a motion to reopen: that it establish "a prima facie case for the underlying substantive relief sought" and that it introduce "previously unavailable, material evidence." Id. at 104.  Moreover, even if the BIA finds that these two requirements are met, it still may use its discretion to deny relief. Id. at 105; see 8 C.F.R. § 3.2(a) ("The Board has discretion to deny a motion to reopen even if the party moving has made out a prima facie case for relief.").  The BIA denied Fesseha's motion to reopen because she "has not established that the new evidence of country conditions establishes prima facie eligibility for asylum."

There is an initial question as to the proper standard of review for denial of motions to reopen based on failure of the applicant to establish prima facie eligibility for asylum.  The Supreme Court has made clear that when the BIA denies a motion to reopen on the basis that the evidence presented was not previously unavailable or material, or when the BIA finds that the two threshold requirements are met but uses its discretion to deny relief, we review under the abuse of discretion standard. INS v. Doherty, 502 U.S. 314, 323 (1992).  However, in Doherty, the Court

-12-

reserved the standard of review question as to determinations by the BIA that the motion to reopen did not make out a prima facie case.  Id.

A later case of this court resolved the question, holding that abuse of discretion review is appropriate even when the BIA grounds its decision in a failure to show a prima facie case for relief.  See Carter v. INS, 90 F.3d 14, 17 (1st Cir. 1996). Therefore, we will reverse the BIA denial of the motion to reopen only if the BIA "misread the law" or acted "in an arbitrary or capricious fashion."  Id.

Fesseha's motion to reopen focused on the continuing difficulties faced by opponents of the regime who sought to participate politically in the new government.  Those difficulties included purely political obstacles as well as detention of EPRP members and rumors of far more harsh treatment.  Even with the new evidence Fesseha presented, her case continued to suffer from a fundamental difficulty.  In its original review of the IJ's decision, the BIA did not believe that she would be identified as a member of the EPRP; therefore, the new evidence describing continued government action against EPRP members and other political opposition did not improve her case in the eyes of the Board.  Moreover, in the evidence Fesseha included with her motion, descriptions of harsher treatment were far less than specific, and she failed to demonstrate that the victims of such treatment were

members of the EPRP, as they are only identified as "critics and suspected opponents" or "opposition groups."

The BIA did not abuse its discretion in finding that Fesseha did not show a prima facie case of eligibility for asylum.

III.

We **affirm** the orders of the BIA.